484 So.2d 1257 (1985)
GARRISON RETIREMENT HOME CORP., etc., d/b/a Palm Crescent Seniors Home, Appellant,
v.
Kenneth Dal HANCOCK and Jeanne Hancock, His Spouse, Appellees.
GARRISON RETIREMENT HOME CORP., d/b/a Palm Crescent Services, Inc., Petitioner,
v.
Kenneth Dal HANCOCK and Jeanne Hancock, His Spouse, Respondents.
Nos. 84-1969, 84-1991.
District Court of Appeal of Florida, Fourth District.
October 2, 1985.
Rehearing and Rehearing Denied April 7, 1986.
*1258 John P. Kelly of Fleming, O'Bryan & Fleming, Fort Lauderdale, for appellant/petitioner.
Brumer, Cohen, Logan & Kandell and Arnold R. Ginsberg of Horton, Perse & Ginsberg, Miami, for appellees/respondents.
Rehearing and Rehearing En Banc Denied April 7, 1986.
DOWNEY, Judge.
Kenneth Dal Hancock and Jeanne Hancock (Hancock) sued Garrison Retirement Home Corporation (Garrison) for damages incurred in an automobile accident with a resident of the Garrison Retirement Home. From an order granting Hancock's motion for summary judgment on the issue of liability, Garrison has filed a non-final appeal. From an order denying Garrison's motion for summary judgment, Garrison has filed a petition for writ of certiorari. The two cases have been consolidated for appellate purposes.
In an abundance of caution so as not to create a precedent for reviewing orders denying motions for summary judgment by certiorari, we pause to explain the exercise of this court's discretion to entertain the petition for certiorari. Ordinarily certiorari would not be granted because review by plenary appeal would be adequate and for other reasons mentioned in Leibman v. Sportatorium, Inc., 374 So.2d 1124 (Fla. 4th DCA 1979); Santini Brothers, Inc. v. Grover, 338 So.2d 79 (Fla. 4th DCA 1976); and Siegel v. Abramowitz, 309 So.2d 234 (Fla. 4th DCA 1975). However, the two orders being reviewed were entered on cross motions for summary judgment and in the interest of economy of judicial labor it is more expedient and practical to review both orders at once. Furthermore, the main issue in both the nonfinal appeal and the petition for certiorari is whether Garrison owed a duty to Hancock.
Petitioner/appellant, Garrison, is a licensed facility under the Adult Congregate *1259 Living Facilities Act, section 400.401 et seq, Florida Statutes (1981). It is a non-skilled facility and is operated solely as a retirement home, as opposed to a nursing home. No one is confined to his room; however, it is a "locked gate" facility and neither visitors nor patients can just walk in or out of the facility without having someone open the gate. The purpose of the locked gates is for the protection of those residents who are not able to take care of themselves if they got outside.
In August, 1981, Tom Egan, age 85, voluntarily came to live at the retirement home. He had his car towed to the retirement home and the car was parked on the premises. Jane Rush, the administrator of the retirement home, became concerned about Tom Egan's potential use of the automobile. Both the car's license tag and Tom's driver's license had expired. Consequently, Jane Rush inquired of her licensing authority, the Department of Health and Rehabilitative Services (DHRS), regarding rules or regulations prohibiting Tom's use or ownership of his automobile while he resided at the retirement home. She was informed by Betty Gunter, DHRS administrator, that under DHRS rules and regulations, she had no right to prevent Tom's use of his car, or prevent him from leaving the facility. The police were then notified at Betty Gunter's suggestion; however, the police told Jane Rush that they only had jurisdiction if, in fact, Tom operated his vehicle in violation of the law.
Nevertheless, the retirement home personnel attempted to immobilize the car by letting air out of the tires, removing the battery cable, barricading it with Jane Rush's car and confiscating Tom's keys. However, Tom obtained a second set of keys and always managed to get the car back into operational condition.
The majority of the residents at the retirement home were senile. Dr. Gerald Stopczynski testified by deposition that he first examined Tom on June 13, 1982, and he diagnosed organic brain syndrome, as well as dementia (commonly referred to as senility) at that time. However, he did not have an opinion on Tom's condition in late 1981 when the accident in question occurred.
On October 13, 1981, Tom was permitted to go out to his car in order to recharge his battery. He started it up and backed into Mrs. Rush's car. Mrs. Rush took Tom inside and then moved her car away from Tom's. While she was moving her car, Tom had one of the retirement home employees open the gate so he could go back out to the car. He then drove off in the car even though he assured the retirement home personnel otherwise. Upon discovery of the situation, the retirement home notified the police, who issued an all-points bulletin for Tom.
While he was returning to the retirement home, Tom's vehicle struck Hancock, who was standing with one foot on the rear bumper of his truck in a swale area on the premises of the retirement home. Hancock, an employee of Latite Roofing Co., had been visiting the retirement home to inspect a roof waterproofing job.
Hancock sued Garrison, alleging that Thomas F. Egan "was a patient and/or enrollee at Garrison's Home and under its care and supervision by virtue of physical and mental infirmities arising from old age and/or sickness; that having undertaken the care and supervision of Egan, Garrison specifically undertook and had the duty to control his actions so as to prevent harm to himself or to third parties." In the alternative, Hancock alleged that Garrison had the authority, right and power to control Egan's activities, having assumed the duty of his care, control, custody and supervision. Having assumed that care and supervision, Garrison owed a duty to third persons to act reasonably in caring for Egan where it knew of Egan's dangerous propensities or penchant for operating a motor vehicle on Garrison's premises under circumstances that constituted a dangerous condition. It is alleged that Garrison knew Egan was a danger to himself and others on the premises and elsewhere when operating his car to which he was allowed access. Therefore, Hancock alleges that Garrison *1260 breached its duty to him when on October 13, 1981, Egan ran his car into Hancock, who was a pedestrian working on Garrison's premises, and severely injured him.
The Florida Adult Congregate Living Facilities Act's stated purpose is:
to provide for the health, safety and welfare of residents of adult congregate living facilities in the state, to promote the growth and continued improvement of such facilities ..., and to ensure that all agencies of the state cooperate in the protection of such residents, and to ensure that needed economic, social, mental health, health, and leisure services are made available to residents of such facilities through the efforts of the Department of Health and Rehabilitative Services, adult congregate living facilities, and other community agencies.
§ 400.401(2), Fla. Stat. (1981).
In addition to this broad enabling clause, the legislature also included in the Act a "resident bill of rights." § 400.428, Fla. Stat. (1981). Among other things, that statute states:
No resident of a facility shall be deprived of any civil or legal rights, benefits, or privileges guaranteed by law, the Constitution of the State of Florida, or the Constitution of the United States solely by reason of status as a resident of a facility. Every resident of a facility shall have the right to:
(b) Be treated with consideration and respect and with due recognition of personal dignity, individuality, and the need for privacy.
* * * * * *
(d) Unrestricted private communication, including . .. visiting with any person of his choice, at any time between the hours of 9:00 a.m. and 8:00 p.m.
(e) Freedom to participate in and benefit from community services and activities and to achieve the highest possible level of independence, autonomy, and interaction within the community.
* * * * * *
(1) Exercise civil and religious liberties, including the right to independent personal decisions.
§ 400.428, Fla. Stat. (1981).
With respect to these guaranteed rights, the Act provides "The facility shall not hamper or prevent residents from exercising their rights as specified in this section." § 400.428(1)(k)(4), Fla. Stat. (1981). Likewise, section 400.428(5), Florida Statutes (1981), prohibits eviction of or retaliation against a resident on the basis of a resident's exercise of his rights.
In addition to the foregoing statutes, the Department of Health and Rehabilitative Services, Aging and Adult Services, has promulgated rules pertaining to the operation of these licensed facilities. For example, Rule 10A-5.18(g), Florida Administrative Code, entitled "Resident Care Standards" provides:
A resident who manifests such behavior as to be destructive to property, himself or others, and/or is chronically disruptive to other residents of the facility shall not be admitted or allowed to remain in a facility.
Chapter 10A-5, Adult Congregate Living Facilities, Fla. Admin. Code (1981). Rule 10A-5.22(1)(i), Florida Administrative Code, entitled "Facility Maintenance/Housekeeping Standards," further provides:
The facility shall keep the facility free of unsafe accumulations of possessions, including equipment and supplies of the residents, staff or owner.
Chapter 10A-5, Adult Congregate Living Facilities, Fla. Admin. Code (1981).
The thrust of Garrison's petition for writ of certiorari is that the trial court departed from the essential requirements of law in finding that Garrison owed a duty to Hancock arising out of its assumption of the care and supervision of Egan. Hancock, on the other hand, contends that Garrison owed him a duty of care 1) because Garrison was obligated to exercise reasonable care in the care and supervision afforded Egan as a resident of the home, and alternatively having assumed the obligation *1261 of care and supervision of Egan in the Home, Garrison had a duty to exercise that care reasonably, and 2) as an owner of the premises on which Egan was driving his car.
Hancock argues that the essential question presented by this case under the first theory of liability is whether his interests were entitled to legal protection from the retirement home's conduct. Section 315, Restatement (Second) of Torts, (1964) provides:
There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another UNLESS:
(a) A special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
(b) A special relation exists between the actor and the other which gives to the other a right to protection.
The special relations referred to in (a) are parent-child, master-servant, land possessor and custodian of a person with dangerous propensities. Restatement (Second) of Torts, § 316-319 (1964). Absent some form of special relationship, the general rule to date in most jurisdictions has been that set forth in section 314 of the Restatement (Second) of Torts (1964), which provides that the fact that a person realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose a duty to take such action. McIntosh v. Milano, 168 N.J. Super. 466, 403 A.2d 500 (1979). Implicit in the special relationship exception, however, is the proposition that such special relationship must include the right or the ability to control another's conduct. Hansenei v. United States, 541 F. Supp. 999 (D.Md. 1982) (Emphasis added). The actions taken by Garrison to prevent Tom from driving his car certainly indicate that they had the ability to control his conduct.
Section 319, Restatement (Second) of Torts (1964), provides:
Duty of Those in Charge of Persons Having Dangerous Propensities
One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.
Although no Florida case has squarely recognized the duty expressed in section 319, in Bradley Center, Inc. v. Wessner, 250 Ga. 199, 296 S.E.2d 693 (1983), the court, citing section 319, Restatement (Second) of Torts, held a private mental health hospital civilly liable for the murder of appellee's mother by appellee's father, a patient in appellant's facility. The court in Bradley identified the legal duty in that case as "where the course of treatment of a mental patient involves an exercise of `control' over him by a physician who knows or should know that the patient is likely to cause bodily harm to others, an independent duty arises from that relationship and falls upon the physician to exercise that control with such reasonable care as to prevent harm to others at the hands of the patient." 296 S.E.2d 696.
Hancock further contends that, having undertaken the duty of caring for and supervising Egan's activities, Garrison is obligated to exercise reasonable care in doing so. He points to section 324A, Restatement (Second) of Torts (1964), which states:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm... . [Emphasis added.]
Garrison takes issue with the application of that rule to this case contending that, under that rule, the duty of care only runs to Egan and not to third parties. However, the cases cited by Garrison do not support that distinction and the rule expressly provides otherwise. Garrison also argues that *1262 the above theory of liability was not raised at the trial court level and therefore has not been properly preserved for review. However, the record reveals that this issue was argued by both parties at the hearing on the cross-motions for summary judgment.
Based upon the peculiar facts of this case, we hold that, having assumed and undertaken the care and supervision of Egan, Garrison owed Hancock a duty to exercise reasonable care in the supervision of Egan's activities as a resident of the retirement home. Granted the duty of a retirement home to its residents is not the same as that imposed upon the operator of an insane asylum or a hospital facility. Nevertheless, the evidence revealed that most of the Garrison residents were senile. The gates were kept locked for the protection of the residents who were not able to take care of themselves if they got outside. Some of the people, including Egan, had physical infirmities. Tom could not walk without aid; he refused a walker but used two canes. He had periods of "rage reaction" and hallucinatory periods. According to Rush, the administrator of the home, Egan's driver's license and car tag had expired. He needed a pillow to see over the steering wheel and Rush testified that she believed him to be a dangerous person behind the wheel of a car. The people in charge of the Home were so concerned about Egan's driving that they resorted to taking his keys, disconnecting his battery, flattening his tires, and finally blockading the car so it could not be moved. But Egan, undaunted, obtained new keys, had his car repaired and finally backed into a blockade, which happened to be the administrator's car. He then motored off on the day of the accident without permission.
As mentioned previously, one of the HRS rules provides that a resident who manifests behavior destructive of property, to himself or others should not be allowed to remain in the Home. Another prohibited residents from bringing unsafe equipment on the premises. The administrator suggested to Dr. Garrison that he get rid of Tom, but he declined because, according to the administrator, the facility was not filled and they needed Tom and his money. On this record, it appears to us that Garrison owed a duty to Egan, to Hancock, and others to prevent Egan from operating his car in view of the knowledge it had regarding his driving capabilities.
We also hold that, under the facts of this case, Garrison owed Hancock, as an invitee on its premises, a duty to eliminate a known danger on the property or at least to warn him of the dangerous condition created by Egan's operation of his car. Appellant argues that appellee failed to plead and prove a premises liability cause of action; however, when this issue was raised at the hearing on the cross-motions for summary judgment, the parties appear to have agreed that such a cause of action was indeed pled.
In view of the foregoing, we hold that Hancock was entitled to a summary judgment on the duty issue. That was a question of law for the court to decide on the facts presented. However, we believe the trial court erred in granting summary judgment on liability against Garrison because there are genuine issues of fact remaining concerning whether the duty was breached; whether the breach, if any, was the proximate cause of the accident; and whether Hancock was guilty of contributory negligence. These are traditional jury questions in tort actions. For example, a jury might find on these facts that Garrison acted reasonably in the efforts expended to try to prevent Egan from driving his car, operating as they were under the apprehension, or misapprehension, that they could not simply prohibit the use of the car in view of the statutory rights afforded residents of the home.
Accordingly, Garrison's petition for writ of certiorari is denied and the summary judgment in favor of the Hancocks is reversed and the cause is remanded for further proceedings.
BARKETT, J., concurs.
LETTS, J., concurs in conclusion only.