780 So.2d 328 (2001)
METROPOLITAN DADE COUNTY, Appellant,
v.
Freddy DUBON, Appellee.
No. 3D99-1279.
District Court of Appeal of Florida, Third District.
March 28, 2001.
Robert A. Ginsburg, County Attorney, and Jason Bloch and Thomas A. Tucker Ronzetti, Assistant County Attorneys, for appellant.
Moscowitz, Starkman & Magolnick and Farah Koran, Miami, for appellee.
Before JORGENSON, GERSTEN, and FLETCHER, JJ.
PER CURIAM.
Miami-Dade County appeals from a final judgment entered on a jury verdict finding the County liable for negligence. For the following reasons, we reverse.
The County operates Beckham Hall, a non-profit, no-fee shelter for homeless *329 men. The shelter offers life skills training, remedial education, and substance abuse recovery programs. Clients are required to obtain employment and save a percentage of their income. Many had psychological or emotional problems; many were drug users or alcoholics who were referred to a mental health facility for evaluation and treatment.
Beckham Hall employed case workers who interacted with the clients and monitors at the facility who handed out meals and assured clients' attendance at Narcotics Anonymous. Although there were rules and regulations to maintain order, Beckham Hall had no security guards, and clients were free to come and go as they pleased.
Beckham Hall prohibited the possession of weapons on the premises; clients were searched for contraband when they initially entered the program. Until the incident involving plaintiff Freddy Dubon, no violent attacks had occurred. Dubon was stabbed in an attack by another client, Luis Garcia. Dubon and Garcia shared a room at Beckham Hall. Garcia, who had been anxious and depressed, verbally threatened Dubon. When Dubon reported the verbal threat to Garcia's case manager, Dubon was told that they "were working on that," as there had been an earlier complaint about Garcia. Garcia stabbed Dubon and then fled. He has not been heard from since. Dubon recovered, and sued the County for negligence.
The jury returned a verdict on liability for Dubon, finding the County 60% at fault for Dubon's injuries, and Dubon 40% at fault.[1] The trial court denied the County's motion for a new trial, and motion for directed verdict. We hold that the County owed no legal duty of care to the plaintiff, and reverse.
Florida courts have refused to find that a party owes a duty to control the conduct of another absent a special relationship. Implicit in the "special relationship" exception to the general rule that no duty is owed is the proposition that the party must have the right or ability to control the third party's behavior.
Lighthouse Mission of Orlando, Inc. v. Estate of McGowen, 683 So.2d 1086, 1088 (Fla. 5th DCA 1996) (citations omitted), review denied, 697 So.2d 510 (Fla.1997). In Lighthouse Mission, the court held that a nonprofit organization that assisted and housed transients and ex-felons was not liable for the criminal attack by one of its residents upon a third party, as it had no control over the assailant.
Florida courts have adopted section 319 of the Restatement (Second) of Torts (1964) which states: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."
Lighthouse Mission, 683 So.2d at 1088 (citations omitted).
In Lighthouse Mission, as in this case, the assailant was "not in the custody or control of [defendants]. There were no restraints on his liberty." Id. Because the defendants did not have either the right or the ability to control the assailant, they did not owe a duty to the plaintiff. Id. See also Akinwande v. City of New York, 260 A.D.2d 586, 688 N.Y.S.2d 651 (N.Y.App. Div.1999) (holding that City owed no special duty to plaintiff for alleged failure to provide adequate security to prevent attacks by third parties at homeless shelter where incident occurred); Abraham v. Wayside Cross Rescue Mission, 289 Ill. App.3d 1048, 225 Ill.Dec. 163, 682 N.E.2d 1240, 1245 (1997) (holding that defendant halfway house did not exert sufficient control over assailant so as to create a common law duty where facility "did not have *330 disciplinary discretion, it did not have armed guards, it could not be locked down, the residents could not be restrained, and the residents could leave the facility at any time.").
Here, both the plaintiff and the defendant were absolutely free to come and go as they chose. Beckham Hall provided valuable services to its homeless residents. It did not have a common law duty to maintain a vigil over those who sought shelter.
Reversed and remanded with directions to grant the County's Motion for Directed Verdict.[2]
JORGENSON and GERSTEN, JJ., concur.
FLETCHER, Judge (dissenting).
For a variety of reasons Metropolitan Dade County (now Miami-Dade County) seeks reversal of a final order. Unlike the panel majority I would conclude that Dade County did have a duty to Dubon. However I would reverse and remand for a new trial for other reasons.
Since 1987 or so the County has operated Beckham Hall, a shelter for homeless men, seeking permanent solutions to homelessness by leading its "clients" toward self-sufficiency. This non-profit, nofee program included, inter alia, life skills training, value clarification activities, remedial education, and Narcotics Anonymous. It also required its clients to obtain employment and to save a percentage of their income. The laudable nature of these activities cannot be disputed.
Frequently clients had mental or emotional problems, and many were drug users or alcoholics. Often clients were referred to a mental health facility (New Horizons) for evaluation and treatment. Beckham Hall employed case workers who interacted with the clients, and monitors who provided supervision at the facility including handing out meals, and assuring clients' attendance at Narcotics Anonymous meetings. The clients had no restraints on them and were free to leave the facility at any time. The program had no employees identified as security guards, but had rules and regulations to maintain order.
One of Beckham Hall's rules prohibited the possession of weapons on the premises. Clients were searched for contraband upon initial entry into the program. The facility experienced no shootings, stabbings, or violent attacks during numerous years of its operation. That is, until Luis Garcia came to the program in 1994. During his case management process Garcia had an argument with another resident and was referred to New Horizons (the mental health facility). Garcia was depressed, anxious, and believed he was "being picked on" by other clients. Notwithstanding, staff members at Beckham Hall concluded that Garcia was not a problem, and seemed to be doing well.
Freddy Dubon, the plaintiff/appellee, began participating in the Beckham Hall program, when he met Garcia. The two shared a room. According to Dubon's testimony, without provocation Garcia threatened to kill Dubon. When Dubon so reported to Garcia's case manager, he was advised that "they were working on that" because of an earlier complaint about a threat by Garcia. Dubon on several more occasions reiterated to the staff Garcia's threat.
Garcia again threatened Dubon one night, and early the following morning made good on that threat, stabbing Dubon with a knife. Dubon was taken to the hospital for treatment. Garcia fled and was not heard from again. A subsequent review of the Beckham Hall communications log revealed that in order to keep trouble down one client had been moved from his room because of an argument with Garcia. Another client had complained *331 that Garcia was disruptive and had an attitude problem.
Dubon filed suit against the County for failing to prevent the attack, alleging negligence, breach of contract (alleging the rules and regulations constituted a contract whereby the County agreed to provide Dubon with a weapon-free environment), and breach of Garcia's contract of which Dubon was alleged to be a third-party beneficiary. The case went to trial on two of the counts, that of negligence being the concern as the jury returned a verdict finding the County 60% negligent and Dubon 40% negligent.
The County contends that it does not have a duty to secure Beckham Hall clients from third-party attacks as it is a unique governmental venture and so does not create any common-law duty. This, the County contends, is especially true as these persons reclaiming their lives and dignity through this unique program are free to leave and return to their unreclaimed lives and lack of dignity on the streets if they discern any threats.
In Trianon Park Condominium Ass'n v. City of Hialeah, 468 So.2d 912 (Fla.1985) the Florida Supreme discussed a government entity's duty in the four basic areas within which government functions. The first of the functions identified are the legislative, permitting, licensing, and executive officer functions. Trianon at 919. Being inherent in the act of governing, these functions are free from judicial interference unless they violate a constitutional or statutory provision.
The second set of functions identified by the supreme court, includes the enforcement of laws and protection of the public safety. Trianon at 919. The court noted the discretionary power given to judges, prosecutors, arresting officers, other law enforcement officials, and fire protection agencies. The court also listed in this category inspectors of various types, such as building, fire, health, elevator, and environmental inspectors.[1]
The third category of governmental functions includes capital improvements and property control. Quite succinctly the court excluded discretionary (planning) functions from liability in this category:
"As this Court has made clear in prior cases, there is no liability for the failure of a governmental entity to build, expand, or modernize capital improvements such as buildings and roads."
Trianon at 920.
However, the court then just as clearly held that an operational function may give rise to liability in this area:
"On the other hand, once a governmental entity builds or takes control of property or an improvement, it has the same common law duty as a private person to properly maintain and operate the property."
Trianon at 920-21.
The fourth category of governmental functions is that of providing professional, educational, and general services for the health and welfare of citizens. Here, the court specifically acknowledged the existence of a duty when it stated:
"These service activities, such as medical and educational services, are performed by private persons as well as governmental entities, and common law duties of care clearly exist."
Trianon at 921.
The court went on to once again make the distinction between a discretionary (planning) function and an operational one excluding discretionary (planning) functions from liability. Trianon at 921 ("Whether there are sufficient doctors provided to a state medical facility may be a discretionary judgmental decision for *332 which the governmental entity would not be subject to tort liability. Malpractice in the rendering of specific medical services, however, would clearly breach existing common law duties and would render the governmental entity liable in tort.")
The court summed up as follows:
"In considering governmental tort liability under these four categories, we find that there is no governmental tort liability for the action or inaction of governmental officials or employees in carrying out the discretionary governmental functions described in categories I and II because there has never been a common law duty of care with respect to these legislative, executive, and police power functions.... On the other hand, there may be substantial government liability under categories III and IV. This result follows because there is a common law duty of care regarding how property is maintained and operated and how professional and general services are performed."
Trianon at 921.
In resolving the immunity issue here, first the category governing Beckham Hall must be ascertained. Readily discarded are the first category (legislative, permitting, licensing, and executive officer functions) and the second category (enforcement of laws and the protection of public safety). Not so discarded are category three (capital improvements and property control operations) and category four (providing professional, educational, and general services for the health and welfare of the citizens). These latter two categories encompass Beckham Hall, a property the operation of which is within the County's control (category three), and which operation consists of service activities of educational, training, and psychological nature (category four). I would conclude that the County is not immune to Dubon's claim.
The majority opinion focuses on the County's duty to Dubon, claiming no need to consider the issue of sovereign immunity. However, under the circumstances herein, I believe the two issues are inextricably linked and both may be resolved by the law as set out in Trianon. I refer once again to the Trianon court's statement that:
"[O]nce a governmental entity builds or takes control of property ... it has the same common law duty as a private person to properly maintain and operate the property."
Trianon at 921.
Thus in City of Belle Glade v. Woodson, 731 So.2d 797 (Fla. 4th DCA), rev. denied, 743 So.2d 11 (Fla.1999), the city was held to have breached its duty to properly maintain and operate its civic center by failing to provide adequate security for a teen dance where it knew from past experience that such dances involved dangerous disorderly conduct. The city had defended on the basis that enforcing the law and protecting public safety is a Trianon category two governmental function for which the city had immunity. The Fourth District Court stated:
"We agree with the plaintiffs that the City, in maintaining and operating the Civic Center, falls within the Trianon Park Category III. Thus, it does not enjoy sovereign immunity but rather has the same common law duty as a private person to properly maintain and operate the property."
City of Belle Glade at 798.
In Avallone v. Board of County Comm'rs of Citrus County, 493 So.2d 1002, 1005 (Fla.1986), the supreme court stated:
"A government unit has the discretionary authority to operate or not operate swimming facilities and is immune from suit on that discretionary question. However, once the unit decides to operate the swimming facility, it assumes the common law duty to operate the facility safely, just as a private individual is obligated under like circumstances."
Hill v. City of North Miami Beach, 613 So.2d 1356 (Fla. 3d DCA 1993) involved a city recreational facility where Hill was *333 injured when struck by another user of the facility. This court observed:
"When the City opened and began operating the recreational facility, it assumed `the common law duty to operate the facility safely, just as a private individual is obligated under like circumstances.' Like a private landowner, the City had the duty to protect invitees from risks that are reasonably foreseeable."
Hill at 1357 (citations omitted). See also Collazos v. City of West Miami, 683 So.2d 1161 (Fla. 3d DCA 1996), rev. denied, 695 So.2d 698 (Fla.1997), and the cases cited therein.
The majority opinion is principally founded on Lighthouse Mission of Orlando, Inc. v. Estate of McGowen, 683 So.2d 1086 (Fla. 5th DCA 1996). Therein the Fifth District Court held that there was no duty owed by the defendants to the decedent as the defendants did not have the ability to control the assailant's behavior. The Fifth District Court did observe that Florida courts have adopted section 319 of the Restatement (Second) of Torts (1964) which states:
"One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing harm."
In Lighthouse Mission, the acts of violence took place not at the mission but at a separate location not controlled by the defendants. Here, the attack took place within Beckham Hall where the County most certainly did have control of Garcia whom the County could have expelled or moved to a different room, away from Dubon.
The Fifth District Court in Lighthouse Mission had relied heavily on Garrison Retirement Home Corp. v. Hancock, 484 So.2d 1257 (Fla. 4th DCA 1985). In Garrison, however, the requisite duty was found to exist as the injury occurred on the retirement home premisesunlike Lighthouse Missionbut like Dubon's injury. Under this circumstance, the Fourth District Court observed that the complaint alleged a cause of action for premises liability and that the plaintiff was entitled to summary judgment on the issue of duty.[2]Garrison, at 1262.
The County owed Dubon a duty to protect him from the reasonably foreseeable risks on the premises associated with the day-to-day operation of Beckham Hall. The jury concluded that the County breached that duty, which conclusion was within the jury's province.
Notwithstanding the foregoing, I would reverse the order appealed based on the County's contentions concerning the argument of Dubon's attorney at trial.[3] During closing argument, Dubon's attorney made various references to his (the attorney's) father, a judge. The attorney related to the jury that his father (the judge) was a strict father who taught him to accept personal responsibility for his actions. He then requested of the jury members that they make the County accept its responsibility to Dubon.[4] The attorney's personal life experiences and the moral teachings of his father the judge are irrelevant to the case. These comments impermissibly suggested *334 to the jury that Dubon's attorney was on a higher moral plane than the County and that the jury had a moral obligation and community duty to find the County liable. See, e.g., Airport Rent-A-Car, Inc. v. Lewis, 701 So.2d 893 (Fla. 4th DCA 1997)(impermissible "conscience of the community" argument extends to all prejudicial pleas intended to evoke a sense of community law through common duty and expectation). The attorney's statements introduced a measure of prejudice to the proceedings that could only be corrected by requiring a new trial. See also Sacred Heart Hosp. of Pensacola v. Stone, 650 So.2d 676, 678-79 (Fla. 1st DCA) (a comment that refers to a matter outside the record or which is not supported by the evidence violates Rule 4-3.4(e), Rules of Professional Conduct, which provides that a lawyer shall not "in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue... or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused"), rev. denied, 659 So.2d 1089 (Fla.1995). While an attorney is given broad latitude in closing argument, counsel's remarks must be confined to the evidence, issues, and inferences that can be drawn from the evidence. See, e.g., Muhammad v. Toys "R" Us, Inc., 668 So.2d 254 (Fla. 1st DCA 1996)(an attorney's expression of his personal opinion as to the credibility of a witness, or of his personal knowledge of facts, is fundamentally improper).
I would reverse and remand for new trial.
NOTES
[1] Dubon also sued the County for breach of an alleged third-party contract; the jury ruled against Dubon on that claim.
[2] Because the issue of duty is dispositive, we do not reach the issues of sovereign immunity or the propriety of remarks made in closing argument.
[1] The court distinguished the operation of automobiles and the handling of firearms to enforce compliance with the law by these officials and employees, finding there is a common law duty of care which allows actions against all governmental entities for violations thereof. Trianon at 920.
[2] The Garrison court also noted that Hancock, the injured party, might be found by a jury to be contributorily negligentas the Dubon jury found Dubon 40% negligent.
[3] The County's remaining issue, regarding jury selection, would therefore be moot.
[4] The specific language used by Dubon's attorney in his closing argument equated his judge-father's moral stance on personal responsibility with the jury's duty to impose those same standards on the County, and to punish it for its alleged lapse in personal responsibility. For example:

[DUBON'S ATTORNEY]: "[A]nd trouble in my house meant something serious because my father, he's a judge ... he's very strict.... [a]nd he could dish out punishment like nobody else could...."
T.409-11.
"They [the County] did nothing to take responsibility for their actions and somebody now has to make them responsible, somebody has to do what my dad did to me,... that was my punishment, I had to apologize.
. . . .
[A]nd it was awful, it was really, really rough but he made me take responsibility for my actions.
It's time for somebody to make them walk around to the neighbors, it's time for somebody to make them responsible."
T.415. I omit other such references.